

**SIGNED this 14th day of October, 2015.**

_____
**TONY M. DAVIS**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 12-10071-TMD |
| | § | |
| ROBBIE THOMAS CROFT | § | CHAPTER 7 |
| GAYLE LYNNE PATEK | § | |
|     Debtors. | § | |

## <u>MEMORANDUM OPINION</u>

Choices.

This case is about choices: the choices made by a family facing financial problems and the choices available under the Bankruptcy Code for resolving those problems. Weighing the choices made in this case, and the choices now available, this Court must choose between dismissal and chapter 7. The U.S. Trustee urges dismissal, which would leave the Debtors to choose between trying to resolve their debts outside bankruptcy or trying to discharge their debts under chapter 13, even though they just failed to complete a chapter 13 case. The Debtors ask the Court to let them remain in chapter 7, despite the fact that they chose to not pay their current

1

income taxes during their failed chapter 13 case, and have made a series of unfortunate financial choices.

I.    **BACKGROUND AND FACTS**

A.  **The story begins with financial difficulties and unpaid taxes.**

The Debtors, Robbie Croft and Gayle Patek, are married. Together, they run a residential real estate appraisal service: he does the appraisals; she keeps the books. In the early 2000s, this business was so successful that the Debtors had as many as five employees.[1] The Debtors' lifestyle kept pace with the success of their business, and then some. In 2007, they chose to lease a Hummer. In 2008 they chose to buy a second home worth over $350,000. And the Debtors continued to own their prior home, using it as a rental property. But prior to acquiring the Hummer and the second home, the Debtors were already financing their lifestyle by failing to pay federal taxes.

Their real estate appraisal business did not escape the economic recession of the late 2000s. Indeed, according to Mr. Croft, "the bottom fell out" in 2008.[2] Making matters worse, in May of 2009, regulatory changes to the way in which residential real estate lenders engaged appraisers forced the Debtors to essentially start over and rebuild their business model in the midst of the down market.[3] By two measures, the Debtors' efforts were successful. First, during their chapter 13 case, the Debtors maintained an average gross income in excess of $140,000,[4]

---

[1] Croft testimony.

[2] *Id.*

[3] *Id.*

[4] U.S. Trustee's Ex. 10-12 (indicating that in 2012 the Debtors grossed $149,000; in 2013 the Debtors grossed $144,000; and in 2014 the Debtors grossed $129,000).

which is more than twice the median income for a household of three. Second, they managed to avoid bankruptcy for another three years.

### B. The bankruptcy begins in chapter 13.

On January 13, 2012, Mr. Croft and Mrs. Patek filed bankruptcy under chapter 13 in order to thwart an attempt by the Internal Revenue Service (IRS) to levy their bank accounts.[5] At that time, the Debtors' owed the IRS $92,000,[6] an astonishing amount that goes far in explaining how the Debtors were able to hold off filing for bankruptcy from 2009 to 2012. Of this total, priority status was claimed for only $41,000. The remaining $51,000 was claimed as general unsecured debt as it was over three years old[7] – a long time to finance expenses with unpaid taxes. And although the $51,000 could be discharged as an unsecured claim, the priority claim of $41,000 remained an obstacle. In order to discharge this debt, the Debtors would have to pay it off in full over the five years of their chapter 13 plan.

The Debtors' other debts were not trivial. Their home, for which the Debtors claimed a value of $360,000, secured a $360,000 debt.[8] Their prior home, still being held as a rental property, was valued at $155,000 but secured debt totaling $163,000.[9] On top of that, the Debtors had incurred $259,000 of unsecured debt to non-IRS creditors.[10]

The Debtors' path to a confirmed chapter 13 plan was neither direct nor easy. Consideration of their first plan, filed on February 8, 2012, was held up by the Debtors' delay in

---

[5] Croft testimony.

[6] *In re Croft*, No. 12-10071, Claim no. 10-3.

[7] *Id.*

[8] *In re Croft*, No. 12-10071, ECF 9, at 1.

[9] *Id.*

[10] *Id.* at 32

filing their tax returns. Also, the chapter 13 Trustee repeatedly objected to the expenses claimed by the Debtors in their expense schedule (Schedule J). In support, the chapter 13 Trustee noted the Debtors' claimed monthly expenses of $850 for food, over $1,000 for transportation, and $770 for leasing the Hummer.[11] Simply put, the chapter 13 Trustee felt that the Debtors should spend less on themselves and pay more to creditors. An amended plan was filed, which drew another objection, but ultimately the Court confirmed a plan for the Debtors on April 10, 2012.

Meanwhile, the Debtors filed four separate statements of income and expenses: the B22C, filed with the original schedules; the original statement of income and expenses (Schedules I and J); and two amendments to Schedules I and J, the last one filed after the plan was confirmed. Although these amendments likely delayed confirmation of the plan, they did not materially change the amount available to pay creditors. The most significant changes were a shift of some expenses from the business category to personal categories, an increase in the amounts paid for currently incurred income taxes from $1,500 to $1,800, and a reduction in the payment on the Hummer from $770 to $550 (possibly a change from a lease to a secured loan, but this is not clear).

The Debtors consistently chose to claim as expenses the $2,665 monthly payment for the mortgage on their home, as well as the $935 monthly mortgage payment on the rental property.[12] They claimed $1,300 of rental income from this property,[13] although how much of that was collected is not clear. During the hearing, Mr. Croft admitted they were no longer receiving that income, and "guessed" that they had stopped paying the mortgage payment on that property

---

[11] *In re Croft*, No. 12-10071, ECF 12.

[12] *Compare In re Croft*, No. 12-10071, ECF 9, at 36 (original Schedule J), *with In re Croft*, No. 12-10071, ECF 34, at 2 (second amended Schedule J).

[13] *In re Croft*, No. 12-10071, ECF 34, at 1.

"four to five months ago." However, according to a pleading filed by the lienholder on that property, the Debtors had not paid the mortgage for nearly ten months prior to the hearing.[14]

### C. The chapter 13 case fails; the Debtors then convert the case to chapter 7.

After the chapter 13 plan was confirmed in April of 2012, things went well until January of 2014 when the chapter 13 Trustee filed a motion to dismiss for failure to make plan payments. This motion was resolved a month later, but then the chapter 13 Trustee filed a notice that an IRS lien had been filed for unpaid 2012 taxes. Shortly thereafter, the IRS filed its own motion to dismiss. According to the IRS, the Debtors had failed to remain current on post-petition federal income taxes for the year 2012 and were $5,096 behind.[15] An agreed order was entered by this Court on May 8, 2014, in which the Debtors agreed to pay in full their federal income taxes for 2012 and 2013 within six months of the agreed order. The Debtors also agreed that if they failed to pay these taxes in six months, the IRS could then unilaterally choose to dismiss the case.[16]

The Debtors chose not to pay the taxes as required by the agreed order. Indeed, the Debtors' unpaid post-petition tax debt had risen to over $34,000. But before the IRS could dismiss the case, the Debtors converted the case from chapter 13 to chapter 7. Unlike a conversion from chapter 7 to chapter 13,[17] or a voluntary dismissal of a chapter 13 case,[18] a

---

[14] *In re Croft*, No. 12-10071, ECF 99, Ex. D.

[15] *In re Croft*, No. 12-10071, ECF 64.

[16] *In re Croft*, No. 12-10071, ECF 68.

[17] *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365 (2007) (finding a "bad faith" exception to the right to convert under 706(a) and dismissing the case because the debtor's concealment of assets was tantamount to bad faith and the debtor therefore forfeited his right to proceed in a chapter 13).

[18] *Jacobsen v. Moser (In re Jacobsen)*, 609 F.3d 647, 660-661 (5th Cir. 2010) (finding that a bankruptcy court has discretion to grant a pending motion to convert where the debtor acted in bad faith and requested dismissal under 1307(b) to avoid conversion).

debtor's right to convert from chapter 13 to chapter 7 is absolute.[19] A debtor is only required to file a notice, upon which conversion is automatic: no motion or court order is required.[20]

The Final Report filed by the chapter 13 Trustee stated that the Debtors had paid approximately $40,000 to fund the confirmed plan, of which $37,000 had been paid towards the Debtors' pre-petition IRS priority claim, with the remaining amount going toward attorney and Trustee fees.[21]

### D.  The U.S. Trustee's motion, chapter choice, and dismissal for abuse.

It is not at all uncommon for debtors who fail to make the payments needed to maintain chapter 13 cases to instead choose to seek relief under chapter 7; indeed, it happens often.[22] The Debtors' choice of chapter 7 here is easy to understand. Although the Debtors will be unable to discharge their priority tax debt (now $38,000),[23] they will be able to discharge their unsecured debt of $310,000.[24] And they will get this fresh start without the chapter 13 requirement of a multi-year commitment to pay all of their "disposable income" – basically all income after deducting necessary expenses of living – to their creditors. The U.S. Trustee objects to this result, arguing that the Debtor's high income and excessive expenses, and persistent failure to

---

[19] *See* Fed. R. Bankr. P. 1017(f)(3); *Harris v. Viegelahn*, 135 S.Ct. 1829, 1835-1836 (2014); *In re Fonke*, 310 B.R. 809, 814 (Bankr. S.D. Tex. 2004). *Compare* 11 U.S.C. § 1307(a) (2014) ("The debtor may convert a case under this chapter to a case under chapter 7 of this title at any time. Any waiver of the right to convert under this subsection is unenforceable."), *with* 11 U.S.C. § 1307(b) (2014) ("On request of a debtor at any time, if the case has not been converted under section 706, 1112, or 1208 of this title, the court shall dismiss a case under this chapter. Any waiver of the right to dismiss under this subsection is unenforceable").

[20] *Harris*, 135 S.Ct. at 1836.

[21] *In re Croft*, No. 12-10071, ECF 74.

[22] Katherine Porter, *The Pretend Solution: An Empirical Study of Bankruptcy Outcomes*, 90 Tex. L. Rev. 103, 112 (2011) ("In this study's sample, one-fourth (26.6%) of Chapter 13 cases converted to Chapter 7 . . . .").

[23] This amount includes $34,000 in post-petition tax debt, U.S. Trustee's Ex. 8, and $4,000 remaining of the pre-petition priority tax debt ($41,000 - $37,000), *see In re Croft*, No. 12-10071, ECF 74.

[24] The Debtors owed $259,000 of unsecured debt to creditors other than the IRS, *In re Croft*, No. 12-10071, ECF 9, at 32, in addition to the $51,000 of general unsecured tax debt.

pay current taxes, together establish "abuse" under section 707(b), and that the case should therefore be dismissed.

So what is "abuse"? Abuse is a term contained in section 707(b) that operates to limit the ability of debtors to seek relief under chapter 7. Prior to 2005, the standard for determining dismissal pursuant to 707(b) was the "substantial abuse" inquiry. A plethora of cases describe circumstances that constitute substantial abuse – from a debtor's ability to make chapter 13 plan payments to a lack of good faith.[25] In practice, dismissal under the substantial abuse standard was reserved for the most egregious cases. In addition, the debtor enjoyed a presumption in favor of getting relief.[26]

This changed in 2005, when Congress passed the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) in an effort to thwart the abusive use of chapter 7 bankruptcy filings and to encourage debtors to file for chapter 13 relief instead.[27] Congress restricted the availability of chapter 7 relief to consumer debtors by repealing the presumption in

---

[25] *See In re Krohn*, 886 F.2d 123, 128 (6th Cir. 1989) (affirming dismissal for substantial abuse where the "totality of the circumstances demonstrated the absence of the degree of honesty and need contemplated by § 707(b)"); *In re Walton*, 866 F.2d 981, 986 (8th Cir. 1989) (affirming dismissal of a chapter 7 case for substantial abuse where the debtor's future income was considered); *Zolg v. Kelly (In re Kelly)*, 841 F.2d 908, 915 (9th Cir. 1988) (affirming dismissal of a chapter 7 case for substantial abuse where the debtors are "clearly able to repay their debts"); *In re Faulhaber*, 243 B.R. 281, 287 (Bankr. E.D. Tex. 1999) (dismissing a case for substantial abuse where the debtors lead "a generally extravagant lifestyle" and had not proceeded in good faith); *In re Watkins*, 216 B.R. 394, 396-97 (Bankr. W.D. Tex. 1997) (dismissing a case for substantial abuse where the debtors (1) had an unreasonable and excessive budget, (2) had unreasonable expenses for continuing education and transportation, (3) the debtors' Schedules I and J was neither reasonable nor accurate, (4) the debtors' good faith was questionable); *In re Fitzgerald*, 155 B.R. 711, 717 (Bankr. W.D. Tex. 1993) (dismissing a case for substantial abuse where the debtors were using chapter 7 as a means to "affirmatively avoid repaying some of their creditors, while satisfying the claim of a relative"); *In re Braley*, 103 B.R. 758, 761, 764 (Bankr. E.D. Va. 1989) (denying motion to dismiss because the court found "mild extravagance exists, but not a substantially abusive extravagance").

[26] 11 U.S.C. 707(b) (2004), *amended by* Bankruptcy Abuse and Consumer Protection Act § 102(a)(1)(B)(ii), Pub.L. 109-8, 119 Stat 23).

[27] *Yuan v. McVay*, No. A-09-CA-833, ECF 11, at 4 (W.D. Tex. 2010), *available at Yuan v. McVay*, No. 09-11401, ECF 53, at 4 (Bankr. W.D. Tex. 2010) (as filed with the bankruptcy court).

favor of granting relief to debtors, lowering the standard from "substantial abuse' to mere "abuse," and offering a new method of determining abuse known as the Means Test. [28]

The Means Test is a numerical analysis that determines chapter 7 eligibility based on the debtor's income and expenses. If the Means Test is not satisfied, the chapter 7 case is presumed abusive.[29] Unless the debtor is able to rebut the presumption under section 707(b)(2)(B), the case must be dismissed, or the debtor must seek relief under chapters 11 or 13. The Debtors here had generally high secured debt and tax liability which might have allowed them to pass the Means Test.[30]And perhaps for this reason, the U.S. Trustee has chosen to seek dismissal, not under the Means Test, but rather under the abuse test of section 707(b)(3).

Under section 707(b)(3), the U.S. Trustee had the further choice of attempting to prove that the Debtors filed the case in bad faith, or that "the totality of the circumstances . . . of the [Debtors'] financial situation demonstrates abuse." The U.S. Trustee has chosen the latter. But before addressing how this latter test applies to the facts here, the Court must first decide the threshold question of whether 707(b) applies at all.

---

[28] *Yuan v. McVay*, No. A-09-CA-833, ECF 11, at 4-5 (W.D. Tex. 2010), *available at Yuan v. McVay*, No. 09-11401, ECF 53 at 4-5 (Bankr. W.D. Tex. 2010) (as filed with the bankruptcy court).

[29] 11 U.S.C. 707(b)(2) (2014).

[30] Section 707 incorporates the National Standards and Local Standards used by the IRS to determine a debtor's expenses for purposes of the Means Test calculation. *See* 11 U.S.C. 707(b)(2)(A)(ii)(I) (2014) ("The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief . . . ."). However, these standards are not applied in the case of secured debt. 11 U.S.C. (b)(2)(A)(iii) (2014).

## II.    LEGAL ANALYSIS

### A.  Can a converted case be dismissed for abuse?

The Debtors argue that, notwithstanding "abuse," this Court may not dismiss this case under any part of section 707(b) because the case was originally filed under chapter 13, and only later converted to chapter 7. There is a split in authorities on this issue.[31] The split arises from two different interpretations of the following language in section 707(b)(1): "[a]fter notice and a hearing, the court . . . may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts. . . ." Thus, section 707(b)(1) governs cases that have the following three characteristics: (1) "filed by an individual debtor," (2) "under this chapter," and (3) involving debts that "are primarily consumer debts . . . ."[32] The basis of the disagreement is the location and effect of the language "under this chapter."

"As in all statutory construction cases, we begin with 'the language itself [and] the specific context in which that language is used.'"[33] However, utilizing canons of statutory construction, cases from both camps have constructed arguments for why the "plain language" of the section supports their opposing conclusions.[34] This alone might be enough to conclude that

---

[31] *See In re Hayes*, No. 13-80035-G3-7, 2015 WL 236275, at *5 (Bankr. S.D. Tex. 2015) (comparing *In re Davis*, 489 B.R. 478 (Bankr. S.D. Ga. 2013); *In re Summerville*, 515 B.R. 651 (Bankr. M.D. Fla. 2014); *In re Perfetto*, 361 B.R. 27 (Bankr. D.R.I. 2007); *In re Lassiter*, No. 08–31578, 2011 WL 2039363 (Bankr. E.D. Va. 2011); *Chapman v. Fokkena (In re Chapman)*, 447 B.R. 250 (B.A.P. 8th Cir. 2011); and *In re Willis*, 408 B.R. 803 (Bankr. W.D. Mo. 2009), with *In re Pate*, No. 11-36919, 2012 WL 6737814 (Bankr. S.D. Tex. 2012); *McDow v. Dudley (In re Dudley)*, 405 B.R. 790 (Bankr. W.D. Va. 2009); *In re Fox*, 370 B.R. 639 (Bankr. D.N.J. 2007); *In re Miller*, 381 B.R. 736 (Bankr. W.D. Ark. 2008); *In re Layton*, 480 B.R. 392 (M.D. Fla. 2012), and *In re Thoemke*, No. 9:12-bk-17027, 2014 WL 443890 (Bankr. M.D. Fla. 2014)).

[32] 11 U.S.C. § 707(b)(1) (2014).

[33] *McNeill v. U.S.*, 131 S.Ct. 2218, 2221 (2011) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

[34] *Compare, e.g., In re Pate*, No. 11-36919, 2012 WL 6737814, at *4 (holding that analysis of plain language supports the conclusion that section 707(b) does not apply to converted cases), *with In re Davis*, 489 B.R.

9

the language is ambiguous. Cases favoring the Debtors hold that the word "filed" refers to both the phrase "by an individual debtor" and the phrase "under this chapter." Since the case was not originally filed under chapter 7, according to the Debtors, section 707(b) does not apply. Cases favoring the U.S. Trustee hold that "filed" only refers to the phrase "by an individual debtor," and so section 707(b) applies to all chapter 7 cases filed by individuals, regardless of what chapter the case started under.

Supporting the U.S. Trustee's position is the nearest-reasonable-referent canon, which would limit the applicability of the word "filed" to the directly following phrase "by an individual debtor."[35] Cases adopting the Debtors' view object to this result on the grounds that it would render the words "under this chapter" superfluous.[36] These cases go on to note that under section 103(b), section 707 can only apply to cases under chapter 7, so there is no need to specify that it applies to cases "under this chapter." [37]

But the words do serve a purpose, and so they are not superfluous. A glance back at section 706 reveals that the same clause is used to distinguish cases "under this chapter" from the "case[s] under" other chapters to which such cases are converted under section 706. Likewise, in section 707(b)(1), the language "under this chapter" is useful to distinguish the chapter 7 case at

---

at 485 (holding that analysis of plain language supports conclusion that section 707(b) does apply do converted cases).

[35] *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 152-52 (2012).

[36] *In re Layton*, 480 B.R. at 395; *In re Pate*, No. 11-36919, 2012 WL 6737814, at *3; *In re Dudley*, 405 B.R. at 794.

[37] *In re Layton*, 480 B.R. at 395; *In re Pate*, No. 11-36919, 2012 WL 6737814, at *3; *In re Dudley*, 405 B.R. at 794.

hand from the "case under" other chapters that the case could be converted to by operation of the next clause in section 707(b)(1).[38]

Further support for the U.S. Trustee's argument that section 707(b) applies to converted cases can be found in section 348, which governs the effect of a conversion. Section 348(a) states that the conversion of a case does not affect the date the case was filed.[39] Therefore, the effect of section 348(a) is to treat a converted case as if it had been filed on the date the original petition was filed. Applying the rule here, the chapter 7 case is deemed to have been "filed" under chapter 7 on the date the original chapter 13 case was filed, not the date the Debtors converted the case.[40] Therefore, even if the word "filed" does apply to "under this chapter," the converted chapter 7 case, considered to have been filed when the chapter 13 case was filed, would fulfill the criteria of section 707(b)(1) as being a "case filed . . . under this chapter."[41]

Although potentially supportive of the U.S. Trustee's interpretation of section 707(b)(1), the effect of section 348(a) on the deemed filing dates also highlights a problem with that interpretation. Section 342(d) requires the clerk of the court to provide notice within 10 days of the petition date that a presumption of abuse under the means test has arisen. Pursuant to section 348(a), the filing of a case converted to another chapter is deemed to have occurred at the time of

---

[38] The same language is also used in section 707(a). And because section 707(a) deals with only dismissal, and not conversion, the argument that the language is unnecessary in section 707(a) gains some purchase. But it could be the case that the drafters included the language "under this chapter" in section 707(a) to match the style of sections 706 and 707(b) – and style is hardly something to sniff at in a textual thicket as dense as the Bankruptcy Code.

[39] 11 U.S.C. § 348(a) (2014). *See also Harris v. Viegelahn*, 135 S.Ct. 1829, 1835 (2015) ("Conversion from Chapter 13 to Chapter 7 does not commence a new bankruptcy case. The existing case continues along another track, Chapter 7 instead of Chapter 13 . . . .").

[40] *In re Chapman*, 477 B.R. at 253.

[41] 11 U.S.C. § 707(b)(1) (2014).

the original filing. Read together, this yields an impossible deadline to meet in most converted cases.

But the Debtors' view also creates an anomaly. Rule 1019(2) of the Federal Rules of Bankruptcy Procedure provides an extension of time to file a motion under section 707(b) in cases converted to chapter 7. This necessarily presumes that section 707(b) applies to cases converted to chapter 7 from another chapter. Where the Bankruptcy Code and the Bankruptcy Rules irreconcilably conflict, the Code controls,[42] but courts should try to interpret the Rules and Code in a way that limits such conflicts.[43]

The language written into most statutes can be located on a spectrum with one end representing language that all would agree is free of ambiguity, and the other end representing language that all would agree is ambiguous. One way to gauge the "plainness" of a provision might be to see where on this spectrum the provision falls by determining how much revision would be needed to free the phrase from ambiguity. Here, all ambiguity can be resolved in favor of the U.S. Trustee's position by simply removing the words "under this chapter."[44] Resolving the ambiguity in favor of the Debtors' position would require the entire phrase to read: "… a case originally filed under chapter 7 by an individual debtor . . . ."

---

[42] 28 U.S.C. § 2075 (2014); *In re Stoecker*, 179 F.3d 546, 552 (7th Cir. 1999) ("[I]n a conflict between the Code and the rules, the Code controls . . . ."); *Fesq v. Branchburg Plaza Associates, L.P. (In re Fesq)*, 153 F.3d 113, 116–20 (3d Cir. 1998); *U.S. v. Towers (In re Pacific Atlantic Trading Co.)*, *IRS v. Chavis (In re Chavis)*, 47 F.3d 818, 822 (6th Cir. 1995); 33 F.3d 1064, 1066 (9th Cir. 1994) ("[A]ny conflict between the Bankruptcy Code and the Bankruptcy Rules must be settled in favor of the Code.").

[43] *See Fuel Oil Supply & Terminaling v. Gulf Oil Corp.*, 762 F.2d 1283, 1287 (5th Cir. 1985) (resolving ambiguity in section 1109(b) relying in part on the section's interaction with Rule 7024).

[44] As noted above, this would omit words that serve the same function in section 707(b) as they do in section 706.

Thus, material revision to section 707(b) is needed to make either position clear, and each position creates an anomaly elsewhere – one with section 348; the other with Rule 1019(2). On this basis, the Court concludes that the language is ambiguous.

This leads the Court to the purpose of the statute.[45] The language at issue in the first sentence of section 707(b)(1) was added to the Code by the Bankruptcy Amendments and Federal Judgeship Act of 1984 (BAFJA) as part of a set of amendments aimed at preventing abuses by consumer filers.[46] BAPCPA further restricted the ability of consumer debtors to seek discharge in chapter 7.[47] In light of these two acts, it is clear that section 707(b) is intended to limit the chapter 7 remedy – the "fresh start" of discharge – to those debtors who need that remedy in order to provide for their basic needs.[48] By contrast, those who have income in excess of those basic needs should be required to pursue relief under the reorganization provisions of chapters 11 or 13.[49] Here, the Debtors' six-figure income should have been enough – indeed, should still be enough – to allow them to live decently and make their chapter 13 payments. The goal is to limit the remedy of chapter 7 to those who need and deserve chapter 7 relief. Since the

---

[45] The U.S. District Court for the Western District of Arkansas also looked to the remedial purposes of the BAPCPA to resolve the ambiguity in section 707(b)(1) in *Justice v. Advanced Control Solutions, Inc.*, No. CIVIL 07-5231, 2008 WL 4368668, at *4 (W.D. Ark. 2008) (concluding that section 707(b) does apply in converted cases). *Accord Barber v. Thomas*, 560 U.S. 474, 481-82 (2010) (resolving textual ambiguity in 18 U.S.C. 3624(b) by considering the apparent purpose of the statute). *See also Martin v. Kilgore First Bancorp, Inc.*, 747 F.2d 1024, 1027 (5th Cir. 1984) ("Regardless of the age of the ambiguity, our duty is to interpret the words of the statute to further the purpose Congress sought to accomplish by its enactment.").

[46] *Perlin v. Hitachi Capital Am. Corp. (In re Perlin)*, 497 F.3d 364, 370 (3d Cir. 2007) (citing Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98–353, 98 Stat. 333).

[47] *See Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 71 (2011).

[48] *In re Goddard,* 323 B.R. 231, 233 (Bankr. S.D. Ohio 2005) (citing S. Rep. No. 65, 98th Cong., 1st Sess. 53, 54 (1983)).

[49] *Id.*; *In re Davis,* 489 B.R. at 484.

limit generally applies to the remedy, and not just to the initial filing,[50] it should not matter how the case got to chapter 7; what should matter is whether the relief is warranted.

Furthermore, if section 707(b) did not apply to converted cases, debtors could simply avoid it by filing under chapter 13 and then exercising their absolute right to convert. This would undermine the goal Congress had in mind when it amended section 707 as part of BAFJA and BAPCPA.[51] Although some of these converted chapter 7 cases could be dismissed on bad faith grounds,[52] in many cases the facts may not so clearly support a finding of bad faith. And some courts have suggested that bad faith adequate for dismissal under section 707(a) requires a more extensive showing than abuse under section 707(b)(3)(B).[53]

---

[50] *See Cortez v. Cortez (In re Cortez)*, 457 F.3d 448, 455 (5th Cir. 2006) ("Section 707(b) does not condition dismissal on the filing of bankruptcy being a 'substantial abuse' but rather on the granting of relief . . . .") (discussing section 707(b) before BAPCPA).

[51] According to one district court:

> When the Court takes into account the ambiguity of the statutory language, along with the remedial purposes of the BAPCPA and the fact that a contrary interpretation would result in a loophole allowing two classes of Chapter 7 cases which are treated differently as to the abuse issue, it is persuaded that § 707(b) does apply to cases converted from Chapter 13 to Chapter 7.

*Justice*, No. CIVIL 07-5231, 2008 WL 4368668, at *4.

[52] *See, e.g., In re Pate*, No. 11–36919, 2012 WL 6737814, at *5-6 (dismissing the case converted to chapter 7 because the debtor did not file or prosecute the chapter 13 case in good faith). Indeed, while the U.S. Trustee here did not plead bad faith in her original motion, the case was there to be made: promising to set aside $1,800 per month for current taxes, failing to pay those taxes, and then being unable to account for the money, is an abuse of the chapter 13 process that rises to the level of bad faith. *Id.* Although making an incorrect estimate of tax obligations or being unable to fully pay taxes while under acute financial strain will not always suggest bad faith, here the Debtors have repeatedly and consistently failed to pay their taxes. The evidence indicates that the Debtors have failed to pay taxes for every year from 2005 to 2013. *See In re Croft*, No. 12-10071, Claim no. 10-3; U.S. Trustee's Ex. 8, 11, 12. This is not an honest mistake or mere negligence.

[53] *See, e.g., In re Perlin*, 497 F.3d at 373 ("'Bankruptcy and district courts have reserved bad faith dismissal for the truly egregious case, often involving individuals with substantial means who have flaunted their wealth, have continued their lavish lifestyles, and are engaging in creative, elaborate schemes to conceal their assets and cheat their creditors or to otherwise inflict harm on third parties.'") (quoting *Tamecki v. Frank (In re Tamecki)*, 229 F.3d 205, 209 (3d Cir. 2000) (Rendell, J., dissenting)); *Huckfeldt v. Huckfeldt (In re Huckfeldt)*, 39 F.3d 829, 832 (8th Cir. 1994); *Industrial Insurance Services, Inc. v. Zick (In re Zick)*, 931 F.2d 1124, 1129 (6th Cir. 1991).

There is at first blush a superficial appeal to the notion that if a debtor is unable to make the payments required by chapter 13, chapter 7 is the only logical choice, and so converted cases should not be subject to dismissal for abuse. But there are many reasons why debtors are unable to make their chapter 13 payments, and there are many more reasons why cases get converted from chapter 13 to chapter 7. Indeed, cases may be converted for no reason at all, given that chapter 13 debtors have an absolute right to convert.[54]

Thus the Court sees in the Bankruptcy Code no countervailing reason why the applicability of the section should depend on how the case arrived in chapter 7, and so sides with the U.S. Trustee's view that converted cases are subject to the abuse standards of section 707(b).

### B.  The evidence establishes that the debts here were primarily consumer debts.

But the U.S. Trustee must clear another hurdle that is unambiguously part of the statute: to dismiss a case under section 707(b)(1), the debts at issue must be primarily consumer debts.[55] On the first page of the Debtors' petition, the Debtors represented that their debts were primarily consumer debts.[56] And although the Debtors made numerous amendments to their schedules, they never changed this designation. In their response to the U.S. Trustee's motion, the Debtors changed course by asserting that the debts are not primarily consumer "considering the rent house mortgage and the large tax debt" but adduced no evidence on the other debts or what

---

[54] 11 U.S.C. § 1307(a) (2014) ("The debtor may convert a case under this chapter to a case under chapter 7 of this title at any time. Any waiver of the right to convert under this subsection is unenforceable."); *In re Michael*, 699 F.3d 305, 309 (3d Cir. 2012) ("At any time during the Chapter 13 proceeding, the debtor has a near absolute right to convert his case."); *Taylor v. Danielson (In re Taylor)*, 472 B.R. 570, 574 (C.D. Ca. 2012) (analyzing the effect of the Supreme Court's decision in *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365 (2007), and holding that the decision does not abrogate the absolute right of a chapter 13 debtor to convert to chapter 7.).

[55] 11 U.S.C. § 707(b)(1) (2014).

[56] *In re Croft*, No. 12-10071, ECF 1.

15

percentage of the total debt was accounted for by the rent house mortgage and tax debts.[57] In any

event, on January 1, 2015, the Debtors filed a certificate indicating that there were no material

changes to their schedules.[58] In light of these two admissions by the Debtors, and absent

testimony to the contrary, the Court finds that the debts here are primarily consumer.

### C. The Debtors' exorbitant house and car purchases, made while in debt to the IRS, their failure to pay current taxes during their chapter 13 case, despite their six-figure income, and their inability to account for their expenditures during the chapter 13 case, together constitute abuse.

A chapter 7 case may be dismissed under section 707(b)(3)(B) if the totality of the

circumstances of the debtor's financial situation demonstrates abuse. The Court exercises

significant discretion in deciding whether to dismiss a case pursuant to section 707(b)(3)(B),[59]

and numerous factors – including ability to pay, need for relief, high expenses, and pre-petition

and post-petition actions – may be taken into consideration.[60] In considering how these factors

apply here, the Court is mindful that bankruptcy was intended to give debtors a fresh start. But

---

[57] *In re Croft*, No. 12-10071, ECF 90, at 2. A case consists of primarily consumer debts if more than half of the total debts are consumer debts. *In re Booth*, 858 F.2d 1051, 1055-1056 (5th Cir. 1988).

[58] *In re Croft*, No. 12-10071, ECF 79.

[59] *Kulakowski v. Walton (In re Kulakowski)*, 735 F.3d 1296, 1298-99 (11th Cir. 2013).

[60] *In re Camp,* 416 B.R. 304, 312 (Bankr. E.D. Tex. 2009) (holding that the following factors should be considered when determining dismissal under totality of the circumstances analysis: (1) whether the debtor could pay substantial portion of their debts from future income in hypothetical chapter 13 case; (2) whether bankruptcy petition was filed due to sudden illness, calamity, disability, or unemployment; (3) whether the debtor incurred cash advances and made consumer purchases far in excess of their ability to repay; (4) whether the debtor's proposed family budget is reasonable; (5) whether the debtor is seeking to reaffirm large amount of secured debt to detriment of unsecured creditors; (6) whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect their true financial condition; (7) whether the debtor has stable source of income; (8) whether the debtor is eligible to file chapter 13 case; (9) whether there are state remedies or private negotiations that the debtor can invoke to ease their financial predicament; (10) whether the debtor's expenses can be reduced without depriving the debtor of basic necessities; and (11) whether petition was filed in good faith); *In re Crink*, 402 B.R. 159 (Bankr. M.D.N.C. 2009) (finding abuse under section 707(b)(3)(B) solely for lack of good faith based on debtors living beyond their means). *See also Cortez v. Cortez (In re Cortez)*, 457 F.3d 448, 455 (5th Cir. 2006) (concluding, pre-BAPCPA, that post-petition events should be considered under section 707(b) up until the effective discharge date).

bankruptcy was not intended to give individuals a head start over other individuals who are able to budget and manage their debts.[61]

The U.S. Trustee has the burden to show by the preponderance of the evidence that the totality of circumstances demonstrates abuse and warrants dismissal.[62] Here, the U.S. Trustee avers that the Debtors' budget is and has been exorbitant to the detriment of the creditors, including the IRS. In the Debtors' favor, though, they were able to successfully pay $40,000 under their chapter 13 plan.[63] Of this amount, $37,000 was applied to the Debtors' pre-petition tax debt.[64] Furthermore, and based upon the originally filed Means Test, the presumption of abuse did not arise.[65]

---

[61] *E.g., In re Wadsworth,* 383 B.R. 330, 334 (Bankr. N.D. Ohio 2007). As the bankruptcy court for the Northern District of Ohio noted:

> [F]rom a practicable standpoint, it would be unfair to always equate a surplus in one's income with an 'ability to pay' under § 707(b)(3). Take, for example, one debtor who seeks to use the bankruptcy process so as to continue living beyond their means versus another debtor who has done everything in their power to economize their monthly expenditures. Obviously, a "totality of the circumstances" analysis under § 707(b)(3)(B) should not treat each of these debtors the same. *In re Music,* 310 B.R. 359, 362 (Bankr. N.D. Ohio 2004). Yet, it is entirely feasible that each debtor could exhibit a like surplus in their monthly budget; or more likely, the debtor attempting to live beyond his means would show less, if any, of a surplus in his monthly income. It thus follows that any § 707(b)(3) analysis, based solely on a surplus in income, is incomplete.

*In re Stewart*, 383 B.R. 429, 434 (Bankr. N.D. Ohio 2008).

[62] *In re Schumacher,* 495 B.R. 735, 739 (Bankr. W.D. Tex. 2013) (citing *In re Dumas*, 419 B.R. 704, 707-08 (Bankr. E.D. Tex. 2009)).

[63] *In re Croft,* No. 12-10071, ECF 74.

[64] *Id.*

[65] The U.S. Trustee acknowledges that the presumption did not arise when the case was initially filed and does not seek dismissal under section 707(b)(2). *In re Croft,* No. 12-10071, ECF 85, at 3.

But this is outweighed by other factors. First, the Debtors were not and are not impoverished. The income projected by the Debtors on their schedules was $135,114.[66] The Debtors' tax returns for 2012-2013 show that the Debtors' actual income was even higher: $148,000 in 2012 and $144,000 in 2013.[67] All these amounts are well above the median income of $57,825 for a household of three.[68] A high income level alone can raise questions as to why a debtor is unable to afford payments to its creditors.[69] The Debtors' gross income has consistently remained well over $100,000 and so the Court finds it difficult to accept that the Debtors are unable to stay current on their tax liabilities and pay something to their creditors.

Comparing the Debtors' budget to the IRS guidelines is informative. The IRS standards were chosen by Congress to serve as presumptive monetary guidelines for the Means Test.[70] These guidelines were developed by the IRS to be used by its field offices in negotiating repayment plans outside of bankruptcy.[71] And while the guidelines are not mandatory under

---

[66] *In re Croft*, No. 12-10071, ECF 34.

[67] U.S. Trustee's Ex. 10, 11. Despite the increase in annual income the Debtors failed to turn over those additional funds to the chapter 13 Trustee pursuant to the 1325(b). And at the hearing the Debtors were unable to account for the additional income received. If those funds were not used for reasonable expenses then the Debtors should have submitted the funds towards their chapter 13 bankruptcy plan. While the Debtors' 2014 income of $129,413 was slightly lower than past years, it still continues to greatly exceed the median income guidelines.

[68] *Id.*

[69] *In re Brenneman*, 397 B.R. 866, 871 (Bankr. N.D. Ohio 2008).

[70] *In re Talley*, 389 B.R. 741, 742 (Bankr. W.D. Wash. 2008).

[71] *See* 26 U.S.C. § 7122(d)(2) (2014) ("The Secretary shall prescribe guidelines for officers and employees of the Internal Revenue Service to determine whether an offer-in-compromise is adequate and should be accepted to resolve a dispute."); *Ransom*, 562 U.S. at 66 (indicating that the guidelines contemplated by section 707(b)(2)(A)(ii)(I) are the same as those contemplated by 26 U.S.C. § 7122(d)(2)).

18

section 707(b)(3), the Court nonetheless used them as a point of reference in determining the reasonableness of the Debtors' ongoing budget.[72]

Two categories of expenses are particularly troublesome. In 2008, the Debtors purchased a 4,112 square foot home for their family of three.[73] At that time, the economic downturn had already started to cause a significant decrease in the Debtors' income, and they already owed the IRS more than $26,000.[74] Unfazed, the Debtors paid over $350,000 for this new house, while keeping their other house.[75] For a household of three, the IRS standard for mortgages expenses in Williamson County, Texas is $1,415 per month. Although the Debtors have recently let go of the rental house, the Debtors' remaining mortgage expenses still total $2,765 per month including taxes, insurance, and home maintenance. This exceeds the IRS guidelines by $1,350.[76]

To assess whether housing expenses are reasonable, the Court may consider various factors; including the "debtor's family size, income level, location and any special needs of the debtor."[77] The evidentiary record is barren of any special needs requiring such a large house. And while some cases have held that housing expenses alone are not enough to find abuse, most courts have held that excessive spending on housing is problematic and can constitute an

---

[72] The IRS guidelines may be used as a reference to determine what is reasonable. *In re Talley* 389 B.R. at 744 (citing *In re Gonzalez*, 378 B.R. 168, 175 (Bankr. N.D. Ohio 2007)).

[73] The square footage is based on the 2015 Williamson County Appraisal.

[74] *In re Croft*, No. 12-10071, Claim no. 10-3. This amount does not include the penalties and interest that had accrued by that time. *Id.*

[75] The exact purchase amount is unknown; however, at the time of the bankruptcy filing in 2012 the home secured a debt of approximately $360,000. *In re Croft*, No. 12-10071, ECF 9, at 18.

[76] *Compare* U.S. Trustee's Ex. 17, at 19, *with In re Croft*, No. 12-10071, ECF 34.

[77] *In Re Talley* 389 B.R. at 744 (citing *In re Kaminski,* 387 B.R. 190, 195 (Bank. N.D. Ohio 2008)).

abuse.[78] Here, the Debtors chose to purchase an expensive home in the midst of their financial struggles and while indebted to the IRS, at that time, for over $26,000. These mortgage expenses greatly exceed the IRS guidelines and are a reflection of the Debtors' fiscal irresponsibility.[79] Additionally, non-mortgage home expenses for the Debtors including electricity, water, telephone, trash, and pest control total $1,138 per month. The IRS guidelines allow for $556 per month. This is a difference of $794. Bankruptcy relief doesn't require debtors to live on a wire, but it does require some sacrifice on their part.[80] If the Debtors re-sized their mortgage and non-mortgage expenses according to IRS guidelines, they would have an additional $2,144 of monthly disposable income to pay to their creditors.[81]

---

[78] *In re Seeburger*, 392 B.R. 735, 743 (Bankr. N.D. Ohio 2008).

[79] In *Viegelahn v. Essex*, 452 B.R. 195 (W.D. Tex. 2011), the District Court, utilizing a similar totality of the circumstances test to determine whether chapter 13 debtors proposed a plan in good faith, pursuant to 1325(a)(3), reversed the bankruptcy court's confirmation of a chapter 13 plan where the debtors sought to retain a house with no equity at an expense in excess of the IRS guidelines while paying the IRS a distribution of only 1%. The bankruptcy court confirmed the plan without considering the reasonableness of the debtors' expenditures under section 1325(b)(3), which incorporates the IRS guidelines via section 707(b)(2)(A)-(B). *Id.* at 197-98. The debtors argued that because section 707(b)(2)(A)(iii)(II) placed no reasonableness requirement on a debtor's monthly payments necessary to maintain possession of the debtor's primary residence, these expenses should not be considered. *Id.* at 200. The District Court held that analysis of good faith under section 1325(a)(3) could be informed, although not wholly decided, by overall compliance with section 1325(b)(3) and, in particular, the reasonableness of expenditures on a debtor's primary residence. *Id.* at 202. The District Court therefore reversed the bankruptcy court's decision and remanded the matter to the bankruptcy court to consider all of the relevant factors. *Id.*

Although *Essex* involved a determination of good faith pursuant to section 1325(a)(3), the Court finds the opinion instructive regarding the considerations relevant in totality of the circumstances analysis under section 707(b)(3)(B). Most directly, bad faith, at least when it is related to the debtor's financial situation, might be a valid consideration under section 707(b)(3)(B). *In re Crink*, 402 B.R. at 178-179. *But cf. In re Ricci*, 456 B.R. 89, 106 (Bankr. M.D. Fla. 2009) ("The 'totality of the circumstances' test of Section 707(b)(3)(B) focuses solely on a debtor's financial situation and the indicia of bad faith are irrelevant."). More generally, *Essex* indicates that a debtor's home mortgage payments, although presumed reasonable pursuant to section 707(b)(2)(A)(iii)(II), may be (and possibly *must be*) considered as part of a totality of the circumstances test. Where there are other aggravating factors, as there are here, excessive mortgage payments are relevant. *See Essex*, 452 B.R. at 201.

[80] *In re Felske,* 385 B.R. 649, 656 (Bankr. N.D. Ohio 2008).

[81] The Debtors' mortgage payments exceed the guidelines by $1,350; their non-mortgage expenses exceed the guidelines by $794; the sum is $2,144.

Although not as significant, the Hummer plays a role in the Court's decision. To obtain the Hummer, the Debtors committed to payments of $770 a month, an extraordinary amount under any standard. Yet, for their business, which requires extensive local travel, the Debtors use a Honda (and have for years). From the testimony, the Honda sounds to be on its last legs. Mr. Croft testified that the Hummer was "primarily a weekend vehicle." So in the midst of severe financial trouble, including a significant tax debt owed to the IRS, the Debtors choose to pay $770 per month to maintain a "weekend vehicle"? This seems to be exactly what Congress had in mind when it tightened the standards for obtaining relief under chapter 7.

The Debtors did reduce the Hummer payment to $550 per month, and it does seem, as suggested by the U.S. Trustee in her brief, that this debt should be paid off soon, which means $550 per month would then available to pay creditors. If forced to make sound choices, which should be one effect of this Court's ruling, the Debtors could choose to trade in the paid-for Hummer for two economical used cars.[82]

Another factor strongly favoring dismissal is the Debtors' continual inability to stay current with their tax obligations. When the chapter 13 bankruptcy was filed, the Debtors owed the IRS $92,000.[83] Approximately $41,000 was priority debt and the remaining $51,000 was general unsecured debt.[84] Despite making payments of $37,000 to the IRS through their chapter 13 plan,[85] the Debtors failed to remain current on their post-petition tax obligations.[86] While

---

[82] This is assuming, as discussed above, that the reduced monthly payments reflect a change from a lease to a financed purchase.

[83] *In re Croft*, No. 12-10071, Claim no. 10-3.

[84] *Id.*

[85] *In re Croft*, No. 12-10071, ECF 74.

[86] U.S. Trustee's Ex. 8.

$1,800 was allotted on the schedule of expenses for their current income tax liabilities, the Debtors nonetheless failed to withhold those funds appropriately and failed, at the hearing, to adequately account for the monies. Mrs. Patek testified that "we tried to pay our 2014 taxes but were not very successful."[87] When asked what happened to the $1,800 allocated for tax liability, Mrs. Patek could only shrug her shoulders and claim it was spent on dental expenses.[88] A year's worth of monthly payments at $1,800 would pay for lot of dental work.

When they converted their case, the Debtors owed an estimated $34,000 for the 2012-2013 tax years.[89] The Debtors were able to pay nearly $37,000 to the IRS while in chapter 13 but only by failing to pay their current income tax liability. Robbing Peter to pay Peter is not fiscal responsibility. Equally important, this Court will not allow the shelter of bankruptcy to excuse non-payment of required taxes. Finally, anyone unable or unwilling to pay ongoing taxes is by definition living an improvident lifestyle.[90]

At a pair of particularly poignant moments in the hearing, both Debtors were asked what they could have done differently. In effect, both testified that they "did the best [they] could"

---

[87] According to their 2014 tax return, the Debtors were in fact fairly successful paying their 2014 taxes. At the time the return was filed, they had paid $17,344 in taxes and owed only $311. U.S. Trustee's Ex. 12. In 2013, however, the Debtors had paid none of their taxes and owed $22,677 when they prepared their return. U.S. Trustee's Ex. 11. This tax liability had not been paid as of October 15, 2014, *see* U.S. Trustee Ex. 8, and there is no evidence that it has been paid since then.

[88] Patek testimony.

[89] U.S. Trustee's Ex. 8. The IRS notified the Debtors on October 15, 2014 that it would seek summary dismissal per the previous agreed order if their 2012 and 2013 taxes were not paid by November 10, 2014. *Id.* The Debtors converted their case on November 12, 2015. *In re Croft*, No. 12-10071, ECF 71. Upon conversion, the Debtors filed a certificate indicating that there were no material changes to their schedules. *In re Croft*, No. 12-10071, ECF 79. From this, the Court concludes that the Debtors made no payments toward the post-petition tax debt indicated by the IRS – the pre-petition tax debt paid through the chapter 13 plan was for the most part replaced by post-petition tax debt.

[90] *In re Hayes*, No. 13-80035-G3-7, 2015 WL 236275 (Bankr. S.D. Tex. 2015) (dismissing the debtor's case after conversion to a chapter 7 and finding that the debtor's housing and utility expenses were 55% of take home pay and exceeded the IRS standards, the debtor proposed to reaffirm excessive secured debt, and the debtor's expenses could reasonably be reduced.).

22

while acknowledging that they could have budgeted better. Yet the pleadings, documents, and testimony amply demonstrate that the Debtors had multiple opportunities during the chapter 13 case to adjust their budget so they could pay their ongoing liabilities, as well as make the required payment to the chapter 13 Trustee. Instead, the Debtors continued to make the poor financial choices that eventually propelled them into a chapter 7. The facts before the Court do not demonstrate a legitimate need for the protections of chapter 7. Rather, the Debtors should be held accountable for continuing to live beyond their means.

Going forward, the Debtors can and must adjust their budget as needed to pay their creditors. Whether this means selling their homestead (they already sold their rental property), working with the IRS and other creditors outside of bankruptcy, re-filing a chapter 13, or downsizing to make payback to their creditors more feasible, the responsibility for these choices ultimately lies with the Debtors. The Debtors' six-figure income should have been enough – indeed, should still be enough – to allow them to live decently and make their chapter 13 payments. Granting chapter 7 relief to the Debtors would be sanctioning abuse of the provisions of the chapter 7.

## III.    **CONCLUSION**

For the reasons stated above, the Court holds that the section 707(b)(3) applies to cases converted to chapter 7 from another chapter. The Court further holds that granting chapter 7 relief in the present case would be an abuse of the provisions of chapter 7. Therefore, pursuant to section 707(b)(1) and (3)(B), the Court will grant the U.S. Trustee's motion to dismiss, unless the Debtors wish to convert the case to chapter 13, which the Court will consider at a status conference to be set by separate order.